UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROSS COOPERMAN, M.D. and ROSS
COOPERMAN, M.D., LLC,

                              Plaintiffs,

                -against-

EMPIRE HEALTHCHOICE HMO, INC. and
EMPIRE HEALTHCHOICE ASSURANCE, INC.,

                              Defendants.

Case No. 1:24-cv-00866 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Ross Cooperman, M.D., and the entity through which he practices, Ross Cooperman

M.D., LLC (together, "Plaintiffs" or the "Practice") bring this action against Anthem

HealthChoice HMO, Inc., and Anthem HealthChoice Assurance, Inc. (together, "Defendants" or

"Anthem"),[1] under the Employee Retirement Income Security Act ("ERISA") of 1974, 29

U.S.C. § 1001 *et seq.* In 2020, the Practice, a provider outside of Anthem's network, performed

medically necessary breast reconstruction surgery on behalf of Y.P. (the "Patient"), a patient

covered by one of Anthem's health benefit plans. Plaintiffs now bring this suit alleging that

Anthem paid only a fraction of what the Practice was entitled to for the services it rendered to the

Patient. In addition to asserting a violation of Section 502(a)(1)(B) of ERISA, 29 U.S.C.

§ 1132(a)(1)(B), the Practice also brings claims for breach of an implied-in-fact contract and

unjust enrichment.

Now before the Court is Anthem's motion to dismiss the Complaint pursuant to Federal

Rule of Civil Procedure ("Rule") 12(b)(6). For the reasons set forth below, Anthem's motion to

---

[1] As of January 1, 2024, Empire HealthChoice HMO, Inc. and Empire HealthChoice Assurance,
Inc. became known as Anthem HealthChoice HMO, Inc. and Anthem HealthChoice Assurance,
Inc. Dkt. 30 ("Mot.") at 1 n.1. The Court therefore refers to Defendants as "Anthem."

dismiss is GRANTED.

## BACKGROUND

### I.    Factual Background[2]

Plaintiff Ross Cooperman, M.D., is a New Jersey–licensed physician who is double board-certified in Plastic and Reconstructive Surgery and General Surgery, with a focus on breast reconstruction and a specialization in microsurgical applications.  Dkt. 14 ("Compl.") ¶¶ 7, 9.  Cooperman practices through Ross Cooperman, M.D., LLC, a practice located in Livingston, New Jersey.  Compl. ¶ 10.  Defendants are health insurers and subsidiaries of Anthem, Inc., now known as Elevance, the largest for-profit managed healthcare company in the Blue Cross Blue Shield Association.  Compl. ¶¶ 11-14.  Plaintiffs are outside of the Anthem network.  Compl. ¶ 2.  The Patient's health benefits plan (the "Plan") allows members to seek healthcare services from either "Participating Providers" or "Non-Participating Providers," but cautions beneficiaries that they "will pay more to see a Non-Participating Provider."  Dkt. 29-1 ("Plan") at 4, 46.[3]  While Participating Providers have a contract with Anthem or another Blue Cross and/or Blue Shield plan, Non-Participating Providers do not.  Plan at 46.  Beneficiaries therefore "must pay the amount of the Non-Participating Provider's charge that exceeds [Anthem's] Allowed Amount."  Plan at 4.

---

[2] Unless otherwise stated, the following facts are taken from the Complaint and assumed true for purposes of this motion.  *See New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 168 (2d Cir. 2023), *amended and superseded on reh'g on other grounds*, 122 F.4th 28 (2d Cir. 2024).

[3] For clarity, the Court refers to the page numbers as set forth on ECF for this document throughout this opinion.

Plaintiffs seek reimbursement for reconstructive breast surgery provided to the Patient. Compl. ¶¶ 3-6.[4]  On July 10, 2020, the Patient, a New Jersey resident with a personal history of breast cancer, underwent a revision bilateral breast reconstruction and related procedures at St. Barnabas Medical Center.  Compl. ¶¶ 16-19.  Dr. Cooperman was the operating surgeon. Compl. ¶ 18.  Dr. Cooperman is an out-of-network provider, and St. Barnabas Medical Center is an out-of-network facility.  Dkt. 29-2 at 4.  Plaintiffs bring this action based on an alleged assignment of benefits from the Patient.  Compl. ¶¶ 20, 106.  Specifically, "[a]s part of the pre-surgical intake process, the Practice obtained from [the Patient] an executed Assignment of Benefits/Designated Authorized Representative/Limited Special Power of Attorney Form," Compl. ¶ 20, which stated in relevant part:

> I hereby assign and convey to the fullest extent permitted by law any and all benefit and non-benefit rights (including the right to any penalties or equitable relief) under my health insurance policy or benefit plan to Ross Cooperman, MD LLC, and Dr. Ross Cooperman (collectively, the "Providers") with respect to any and all medical/facility services provided by the Providers to me for all dates of service . . . .

> In the event the insurance carrier responsible for making medical payments to Ross Cooperman, MD LLC and Dr. Ross Cooperman for medical services rendered to me does not accept my assignment of benefit rights, or my assignment is challenged or deemed invalid, I execute this limited/special power of attorney and appoint and authorize Provider and his/her/its attorney (or other representative) as my agent and attorney, in fact, to assert any and all of my benefit and non-benefit rights for and on my behalf, including, without limitation, to bring any appeal, pre-litigation demand, demand for payment, arbitration, lawsuit, independent dispute resolution or administrative proceeding, for and on my behalf, in my name against any person and/or entity involved in the determination and payment of benefits under any insurance policy or benefit plan.  I agree that any recovery shall be applied to payment due my provider and attorney fees and costs.

Compl. ¶ 21.

---

[4] "The health plan at issue . . . is a fully funded [Anthem] preferred provider organization (PPO) plan with health savings account (HSA)."  Compl. ¶ 15.

In the lead-up to the procedure, "as part of the Practice's normal protocol," the Practice corresponded with Anthem regarding reimbursement and preauthorization. Compl. ¶ 22. On June 2, 2020, a Practice staff member called Anthem to obtain the Patient's insurance reimbursement information and to initiate the preauthorization process. Compl. ¶ 22. Anthem's conduct was consistent with the terms of the Plan, which require either the beneficiary or the beneficiary's provider to contact Anthem to request preauthorization for certain procedures. Plan at 50.[5]

The Practice spoke with Anthem staff member Shane E., who conveyed that the Plan was a "New York-based [Anthem] fully funded plan that provided [the Patient] with out-of-network benefits." Compl. ¶ 23. A little over two weeks later, on June 18, 2020, Practice staff contacted Anthem to request, "among other things, a 'Gap exception,' which is a request that [Anthem] treat the Practice as an in-network provider." Compl. ¶ 24. The Plan provides for a Gap exception as follows:

> If We do not have a Participating Provider for certain provider types in the county in which You live or in a bordering county that is within approved time and distance standards, We will approve an authorization to a specific Non-Participating Provider until You no longer need the care or We have a Participating Provider in Our network that meets the time and distance standards and Your care has been transitioned to that Participating Provider. Covered Services rendered by the Non-Participating Provider will be paid as if they were provided by a Participating Provider. You will be responsible only for any applicable in-network Cost-Sharing.

Compl. ¶ 24; *accord* Plan at 49.

---

[5] "Although the Plan was not attached as an exhibit to the complaint, it is integral to the complaint and is incorporated by reference — indeed, it is repeatedly referenced in the complaint and forms the very basis for plaintiffs' claims. It is therefore properly considered by the Court on deciding the instant motion to dismiss." *Pro. Orthopaedic Assocs., PA v. 1199 Nat'l Benefit Fund*, No. 16-cv-04838 (KBF), 2016 WL 6900686, at *1 n.2 (S.D.N.Y. Nov. 22, 2016) (first citing *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); and then citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)), *aff'd*, 697 F. App'x 39 (2d Cir. 2017) (summary order).

In response to the Practice's request for a Gap exception, an Anthem staff member directed the Practice to "submit clinical notes and other documentation supporting the necessity of the procedure." Compl. ¶ 25. The Practice immediately did so by facsimile transmission. Compl. ¶ 25. During the conversation with Anthem about the Gap exception, the Practice also inquired about payment arrangements for the care. Compl. ¶ 26. The Practice proposed that the parties enter a "single case agreement," wherein the Practice and Anthem would "agre[e] . . . upfront as to the reimbursement that the Practice would receive directly from [Anthem] for the services provided." Compl. ¶ 26.

In response to the Practice's inquiries, an Anthem employee informed the Practice on June 18, 2020, that "[Anthem]'s protocol was to negotiate single case agreement *after* the out-of-network provider . . . provided the services." Compl. ¶ 27. The Practice spoke with Anthem staff twice more on July 2, 2020. Compl. ¶ 28. During the second call, Anthem once more reiterated that its "protocol was to negotiate a single case agreement after the out-of-network provider rendered the services." Compl. ¶ 28. Anthem also informed the Practice that it "was approving pre-authorization for all requested surgical codes involved in [the Patient]'s scheduled July 10, 2024 procedure." Compl. ¶ 29.

The Practice did not receive a formal letter from Anthem documenting preauthorization until 10 days after the surgery, on July 20, 2020. Compl. ¶ 30. At that time, the Practice "noticed that the letter did not list one of the surgical codes for which the Practice had requested pre-authorization." Compl. ¶ 30. The Practice reached out to Anthem about the issue the next day, and on July 22, 2020, the Practice received a new preauthorization letter listing all the surgical codes involved in the Patient's procedure. Compl. ¶¶ 31-33. The letter was backdated to July 2, 2020. Compl. ¶ 33.

Shortly after the surgery, on or before July 29, 2020, the Practice submitted its claim for services provided to the Patient on July 10, 2020, to the local Blue Cross Blue Shield Association plan for New Jersey, Horizon Blue Cross Blue Shield ("Horizon" or the "Host Blue"). Compl. ¶¶ 35, 37.[6] The Practice submitted its claim for benefits in accordance with the terms of the Plan, which provides that "[c]laims for services must be submitted to [Anthem] for payment within 120 days after [the beneficiary] receive[s] the services for which payment is being requested." Plan at 90. The Practice sought reimbursement in the amount of $341,362.00. Compl. ¶ 38. Plaintiffs allege that the HFCA Form 1500 submitted to Horizon also "informed Horizon (and [Anthem]) that the Practice had an assignment-of-benefits on file for" the Patient. Compl. ¶ 39. "On or about August 11, 2020, the Practice received an Explanation of Benefits on its claim from Horizon," providing for a benefit of $4,769.15. Compl. ¶ 41. When the $476.89 co-insurance amount was applied to the benefit, the amount the Practice was actually paid was only $4,292.00. Compl. ¶ 42.

The Practice sought reconsideration of the reimbursement amount through the Plan's grievance and appeals process. Compl. ¶¶ 43-57. On or about August 19, 2020, the Practice submitted a grievance appeal regarding the reimbursement amount to Horizon's Blue Card Claim Appeal Unit in New Jersey. Compl. ¶ 44. Horizon acknowledged receipt of the grievance appeal in a September 8, 2020 letter to the Practice, Compl. ¶ 45, and on September 15, 2020,

---

[6] As explained in Plaintiffs' Complaint, Anthem "is a member of the Blue Cross Blue Shield Association, which is comprised of the various Blue Cross Blue Shield plans doing business throughout the United States." Compl. ¶ 34. The services at issue here were not rendered in Anthem's service area in eastern New York state, but in New Jersey, and are therefore subject to the Blue Card Program. Compl. ¶¶ 35-36. Under the Blue Card Program, "when [a beneficiary] receive[s] Covered Services within the geographic area serviced by a Host Blue, [Anthem] will still fulfill [its] contractual obligations. But the Host Blue is responsible for: (a) contracting with its Providers; and (b) handling its interactions with those Providers." Compl. ¶ 36; Plan at 57.

Anthem acknowledged receipt and indicated that it had commenced processing the grievance, Compl. ¶ 46.

In a letter to the Patient dated October 6, 2020, Anthem stated "that it was denying the grievance appeal's request for additional reimbursement and upholding the initial reimbursement determination." Compl. ¶ 47. Anthem specifically stated that "it had processed the claim at the Plan's in-network benefits level," and "applied the 10% in network coinsurance amount." Compl. ¶ 48. Anthem further explained that the "payment amount represented 90% of what it determined to be the Allowed Amount for the services under the Plan." Compl. ¶ 49. Anthem indicated that the Patient was "responsible for the difference between the health plan allowance and the provider's charge, also known as, balance billing." Compl. ¶ 52. Plaintiffs allege that Anthem "calculated the Allowed Amount based upon 330% of the Centers for Medicare and Medicaid Provider fee schedule." Compl. ¶ 50. According to Plaintiffs, Anthem "relied upon this fee schedule when calculating the Allowed Amount based on a Plan provision . . . which states that the Allowed Amount for non-participating providers located in [Anthem]'s service area who are not facilities" is 330% of the Medicare fee schedule. Compl. ¶ 51.

On February 23, 2021, "the Practice, through its then counsel, submitted another appeal to [Anthem] and Horizon challenging the . . . reimbursement amount set forth in the August 11, 2020 Explanation of Benefits." Compl. ¶ 53. Horizon responded to the appeal on May 25, 2021, "stating that it had reviewed the facts 'carefully' and determined that the 'claim was priced according to the member's out-of-network benefits.'" Compl. ¶ 54. The next day, on May 26, 2021, "the Practice, through its then counsel, submitted yet another appeal to [Anthem] and Horizon," Compl. ¶ 55, and on June 30, 2021, the Practice submitted a fourth appeal to Anthem and Horizon challenging the reimbursement amount, Compl. ¶ 56.

Several months later, Anthem issued its final determination, stating in a letter dated September 1, 2021 that "'after further review' of the claim," it "ha[d] determined that the charges for the services rendered have processed correctly."  Compl. ¶ 57.

The Practice maintains that, because Anthem granted the Practice a Gap exception requiring it to pay the Practice at the in-network level, Anthem must increase its reimbursement by $337,059.74.  Compl. ¶ 68.  Alternatively, the Practice contends that even if Empire did not grant the Practice a Gap exception, it still reimbursed the claim at an "improperly low amount." Compl. ¶ 69.  The Practice maintains that, based on applicable Host Blue pricing for out-of-network services, Anthem should have reimbursed the Practice at least $153,351.  Compl. ¶ 78.

## II.    Procedural History

Plaintiffs commenced this action in the Supreme Court of the State of New York, County of New York on January 2, 2024, by filing a summons with notice, seeking damages under ERISA Section 502(a)(1)(B) to recover benefits for medical services provided, as well as for breach of contract, promissory estoppel, and unjust enrichment to recover reimbursement for medical services provided to the Patient.  *See* Dkt. 5 ¶ 1; Dkt. 5-1 (summons with notice).  On February 7, 2024, Anthem removed the case to this Court based on federal question jurisdiction. *See* Dkt. 5 ¶ 4.

On March 15, 2024, Plaintiffs filed their complaint here in federal court, alleging three claims: (1) a violation of ERISA for underpayment of benefits; (2) a breach of an implied-in-fact contract; and (3) unjust enrichment.  *See* Compl. ¶¶ 105-128.  On April 18, 2024, the parties requested a stay of discovery and an adjournment of the initial pretrial conference pending a decision on Anthem's forthcoming motion to dismiss, Dkt. 19, and on the same day, the Court granted the request, Dkt. 20.  Anthem filed its motion to dismiss on August 14, 2024.  Dkt. 30

("Mot."). Plaintiffs filed their opposition on September 30, 2024, Dkt. 37 ("Opp."), and Anthem

filed its reply on November 21, 2024, Dkt. 40 ("Reply").

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*,

992 F.3d 67, 72 (2d Cir. 2021) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The Court draws all reasonable inferences in the plaintiff's favor and accepts as true all

nonconclusory allegations of fact. *Id.* However, a complaint must allege "more than a sheer

possibility that a defendant has acted unlawfully" and more than "facts that are 'merely

consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

557) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Determining whether a

complaint states a plausible claim is "a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

In considering a Rule 12(b)(6) motion to dismiss, "district courts 'may review only a

narrow universe of materials,' which includes 'facts stated on the face of the complaint,

documents appended to the complaint or incorporated in the complaint by reference, matters of

which judicial notice may be taken,' as well as 'documents not expressly incorporated by

reference in the complaint that are nevertheless "integral" to the complaint.'" *Clark v. Hanley*,

89 F.4th 78, 93 (2d Cir. 2023) (alterations and omissions adopted) (quoting *Goel v. Bunge, Ltd.*,

820 F.3d 554, 559 (2d Cir. 2016)). "Where a document is referenced in a complaint, 'the

documents control and this Court need not accept as true the allegations in the . . . complaint.'"

*Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quoting *Rapoport v. Asia Elecs. Holding

Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

## DISCUSSION

Anthem moves to dismiss on several grounds. Anthem alleges that Plaintiffs have failed to state a claim under ERISA because Plaintiffs lack standing to bring their claim due to the valid and enforceable anti-assignment provision in the Patient's Plan. Mot. at 5-10. In the alternative, Anthem argues that Plaintiffs' ERISA claim is time barred under the Plan terms, *id.* at 10-11, and if not time-barred, that Plaintiffs fail to state a claim under Section 502(a)(1)(B) for additional benefits, *id.* at 12-13. With respect to Plaintiffs' state law claims for breach of an implied contract and unjust enrichment, Anthem argues that those claims are expressly preempted by ERISA, *id.* at 13-14, and, in the alternative, that Plaintiffs have not sufficiently pleaded the necessary elements for those claims, *id.* at 15-19.

## I.    Anti-Assignment Provisions and Statutory Standing[7]

The Court turns first to Anthem's argument that Plaintiffs lack standing to bring a claim under ERISA Section 502(a)(1)(B) "due to the valid and enforceable anti-assignment provision in the Patient's [P]lan." Mot. at 5 (further capitalization omitted). For the reasons set forth below, the Court agrees.

---

[7] Although the parties have briefed Plaintiffs' ability to bring a claim under ERISA Section 502(a)(1)(B) as a standing issue, the relevant inquiry is really whether Plaintiffs can assert a cause of action under ERISA. *See, e.g.*, *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("The Supreme Court has recently clarified, however, that what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.'" (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014))); *see also Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 117 n.5 (2d Cir. 2025) ("'Statutory standing,' as distinct from Article III standing, relates to the merits, that is whether a particular plaintiff 'has a cause of action under the statute.' Because so-called statutory standing does not implicate 'the court's statutory or constitutional *power* to adjudicate the case,' this term is 'misleading.'" (first quoting *Am. Psychiatric Ass'n*, 821 F.3d at 359; and then quoting *Lexmark*, 572 U.S. at 128 n.4)).

### A. Assignment of Benefits

"Under § 502(a), a civil action may be brought 'by a participant or beneficiary' of an ERISA plan to recover benefits due to him under the terms of that plan." *McCulloch Orthopaedic Surgical Servs.*, *PLLC v. Aetna, Inc.*, 857 F.3d 141, 146 (2d Cir. 2017) (quoting 29 U.S.C. § 1132(a)(1)(B)). "ERISA defines 'beneficiary' as 'a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder.'" *Simon v. Gen. Elec. Co*., 263 F.3d 176, 177 (2d Cir. 2001) (per curiam) (quoting 29 U.S.C. § 1002(8)). "The statute defines 'participant' as 'any employee or former employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan.'" *Id.* (quoting 29 U.S.C. § 1002(7)). "Generally, § 502(a) is narrowly construed to permit only the enumerated parties to sue directly for relief." *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 329 (2d. Cir. 2011) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 27 (1983)); *accord Simon*, 263 F.3d at 177 (citing *Franchise Tax Bd.*, 463 U.S. at 27). The Second Circuit has, however, carved out a "narrow exception to the ERISA standing requirements" for "healthcare providers to whom a beneficiary has assigned his claim in exchange for health care." *Simon*, 263 F.3d at 178 (citing *I.V. Servs. of Am., Inc. v. Trs. of Am. Consulting Eng'rs Council Ins. Tr. Fund*, 136 F.3d 114, 117 n.2 (2d Cir. 1998)); *accord Montefiore Med. Ctr*., 642 F.3d at 329. The Practice seeks to invoke this narrow exception, asserting that the Patient assigned all benefits under her Plan to the Practice, and that they therefore have "standing to pursue claims under ERISA" as the Patient's assignee. Compl. ¶ 106; *see id.* ¶¶ 20-21.

"Valid anti-assignment provisions," however, "render [a plaintiff's] 'acceptance of the assignment . . . ineffective — a legal nullity.'" *Neurological Surgery P.C. v. Aetna Health, Inc.*,

511 F. Supp. 3d 267, 282 (E.D.N.Y. 2021) (omission in original) (alterations adopted) (quoting *McCulloch*, 857 F.3d at 147); *see also Mbody Minimally Invasive Surgery P.C. v. Empire Healthchoice HMO, Inc.*, No. 13-cv-06551 (TPG), 2014 WL 4058321, at *3 (S.D.N.Y. Aug. 15, 2014) ("If a health insurance plan 'unambiguously prohibits assignment, an attempted assignment will be ineffectual.'" (quoting *Neuroaxis Neurosurgical Assocs., PC v. Costco Wholesale Co.*, 919 F. Supp. 2d 345, 351 (S.D.N.Y. 2013))); *Merrick v. UnitedHealth Grp. Inc.*, 175 F. Supp. 3d 110, 119 (S.D.N.Y. 2016) ("District Courts in this Circuit . . . have found that 'where plan language unambiguously prohibits assignment, an attempted assignment will be ineffectual . . . and . . . a healthcare provider who has attempted to obtain an assignment in contravention of a plan's terms is not entitled to recover under ERISA.'" (omissions in original) (alterations adopted) (quoting *Neuroaxis Neurosurgical Assocs.*, 919 F. Supp. 2d at 351-52)); *accord Neurological Surgery, P.C. v. Travelers Co.*, 243 F. Supp.3d 318, 327 (E.D.N.Y. 2017).

Here, the Plan incorporates a clear and unambiguous anti-assignment provision:

> You cannot assign any benefits under this Certificate [of Coverage] or legal claims based on a denial of benefits or request for plan documents to any person, corporation, or other organization. You cannot assign any monies due under this Certificate to any person, corporation or other organization unless it is an assignment to Your Provider for a surprise bill or to a Hospital for Emergency Services, including inpatient services following Emergency Department Care. . . . Any assignment of benefits or legal claims based on a denial of benefits or request for plan documents by You other than for monies due for a surprise bill or an assignment of monies due to a Hospital for Emergency Services . . . will be void and unenforceable.

Plan at 70.

Given this, if the anti-assignment provision applies and is enforceable, the purported assignment of benefits and/or claims by the Patient to the Practice is necessarily void. The Court must then determine whether the anti-assignment provision is enforceable.

### B. Enforceability of the Anti-Assignment Provision

The Practice raises several grounds for finding the Plan's anti-assignment provision ineffectual.  The Court addresses each in turn.

### 1. Plan Exceptions to the Anti-Assignment Provision Do Not Apply

First, Plaintiffs argue that they fall squarely within the "surprise bill" exception to the anti-assignment provision.  Opp. at 4-5.  The Plan's exceptions to the anti-assignment provision, however, do not apply.

The Plan expressly carves out two exceptions to its otherwise categorical prohibition on assignments: the first for "surprise bill[s]," and the second for "Emergency Services, including inpatient services following Emergency Department Care."  Plan at 112.  The latter exception allows beneficiaries to assign their rights to providers for treatment of emergency conditions that might cause serious harm in the absence of immediate medical attention.  Specifically, the Plan defines an emergency condition as:

> A medical or behavioral condition that manifests itself by Acute symptoms of sufficient severity, including severe pain, such that a prudent layperson, possessing an average knowledge of medicine and health, could reasonably expect the absence of immediate medical attention to result in:
>
> - Placing the health of the person afflicted with such condition, or with respect to a pregnant woman, the health of the woman or her unborn child in serious jeopardy, or in the case of a behavioral condition, placing the health of such person or others in serious jeopardy;
> - Serious impairment to such person's bodily functions;
> - Serious dysfunction of any bodily organ or part of such person; or
> - Serious disfigurement of such person.

*Id.* at 67.  Plaintiffs do not invoke this exception, and the circumstances alleged here do not appear to fall within the definition of an "emergency condition" under the Plan.  Therefore, this contractual exception to the anti-assignment clause is inapplicable.

Instead, Plaintiffs rely on the carveout for "surprise bills." Opp. at 4-5. A "surprise bill" is specifically defined under the Plan in two ways. First, a "surprise bill" covers "services performed by a non-participating Physician at a participating Hospital or Ambulatory Surgical Center" in three circumstances: when (1) "[a] participating Physician is unavailable at the time the health care services are performed"; (2) "[a] non-participating Physician performs services without [the beneficiary's] knowledge"; or (3) "[u]nforeseen medical issues or services arise at the time the health care services are performed." Plan at 51. The Complaint's allegations foreclose the application of this exception. For one, St. Barnabas Medical Center is an out-of-network facility, *see* Dkt. 29-2 at 4,[8] and under the Plan, a surprise bill is a bill for services performed by a "non-participating physician at a *participating* hospital or ambulatory surgical center." Plan at 51 (emphasis added) (capitalization omitted). This alone renders the exception inapplicable. Moreover, even if St. Barnabas Medical Center were a participating hospital, Plaintiffs have not alleged that they fall within any of the three categories of services by a non-participating physician at a participating hospital recited above and set forth in the Plan. That the Practice obtained preauthorization for the underlying procedures in advance of the Patient's surgery contradicts the assertion that the bill was "unforeseen" or that it otherwise constituted a "surprise." In fact, the Plan explicitly states that "[a] surprise bill does not include a bill for health care services when a participating Physician is available and [the beneficiary] elected to receive services from a non-participating Physician." *Id.* at 51.

---

[8] A July 1, 2020 letter from Anthem to the Patient appended to the Declaration of Frances Schultz in support of Anthem's motion to dismiss, Dkt. 29, expressly states that St. Barnabas Medical Center is an out-of-network facility. Dkt. 29-2 at 4. Anthem mailed the same letter to Dr. Cooperman and St. Barnabas Medical Center. *Id.* at 7, 11.

The second definition of a "surprise bill" set forth in the Plan applies when a beneficiary was "referred by a participating Physician to a Non-Participating Provider without [the beneficiary's] explicit written consent acknowledging that the referral may result in costs not covered by [Anthem]." Plan at 51. The Plan states that a "referral to a Non-Participating Provider" means either that: (1) "Covered Services are performed by a Non-Participating Provider in the participating Physician's office or practice during the same visit"; (2) "[t]he participating Physician sends a specimen taken from [the beneficiary] in the participating Physician's office to a non-participating laboratory or pathologist"; or (3) "[f]or any other Covered Services performed by a Non-Participating Provider at the participating Physician's request, when referrals are required under [the beneficiary's] Certificate." *Id.* Plaintiffs allude to this exception to the anti-assignment clause in their opposition papers, stating that "[p]ursuant to New York law, the service that was provided to [the Patient] is a surprise bill, because an in-network physician referred [the Patient] to the Practice who conducted the services in an in-patient hospital setting." Opp. at 5. Plaintiffs, however, have not pleaded any facts in the Complaint that trigger this exception. Principally, Plaintiffs have not pleaded in the Complaint that an in-network physician referred the Patient to the Practice, let alone that they did so without first procuring the Patient's express consent as required by the "surprise bill" exception. Nor do Plaintiffs allege in the Complaint that referrals were required under the beneficiary's certificate for the procedures performed. Plan at 51. Plaintiffs therefore also fail to plausibly plead the applicability of this second "surprise bill" exception.

Perhaps realizing that they do not fall within the aforementioned exceptions to the anti-assignment clause, Plaintiffs contend that they fall within a "Gap exception for a surprise bill." Opp. at 5. But Plaintiffs conflate separate and distinct provisions in the Plan. Separate from the

surprise-bill section of the Plan, the so-called Gap exception provides that a non-participating provider will be treated like a participating provider if Anthem determines a participating provider is not available.  Plan at 49.  In those circumstances, the beneficiary will be held responsible only for in-network cost sharing.  *Id.*  The Gap exception makes no reference, however, to the anti-assignment clause and does not provide for any exemption therefrom.  And while the "surprise bill" exception to the anti-assignment provision covers circumstances in which a "participating physician is unavailable," the services must still have been "performed by a non-participating Physician at a participating Hospital or Ambulatory Surgical Center" to fall within the exception.  *Id.* at 51.  As set forth above, Plaintiffs have not pleaded that the services were provided at a participating hospital, and there is no freestanding Gap exception to the anti-assignment clause that otherwise applies.

### 2.  The Anti-Assignment Clause Is Not Contradictory or Ambiguous

Second, Plaintiffs argue that the anti-assignment clause is "contradictory and ambiguous" and therefore "unenforceable."  Opp. at 2.  The Court disagrees.  "When assessing possible ambiguity of a plan's terms[,] the Second Circuit 'interpret[s] ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience.'"  *Farkas v. UFCW Loc. 2013 Health & Welfare Fund*, No. 17-cv-02598 (RJD) (RER), 2018 WL 5862741, at *2 (E.D.N.Y. Sept. 12, 2018) (second alteration in original) (quoting *Critchlow v. First Unum Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004)).  "Language 'is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who examined the context of the entire . . . agreement.'"  *Merrick*, 175 F. Supp. 3d at 122 (omission in original) (quoting *Critchlow*, 378 F.3d at 256).  "[B]ecause [the Second Circuit] appl[ies] rules of contract law to ERISA plans, a court must not 'rewrite, under the guise of interpretation, a

term of the contract when the term is clear and unambiguous . . . .'"  *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 81 (2d Cir. 2009) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)) (citing *Lifson v. INA Life Ins. Co. of N.Y.*, 333 F.3d 349, 353 (2d Cir. 2003)).  Other than making the conclusory assertion that the anti-assignment clause is "contradictory and ambiguous," Opp. at 2, however, Plaintiffs provide no basis for finding the language of the anti-assignment provision unclear.  Indeed, there is none.  The anti-assignment provision straightforwardly provides that beneficiaries "cannot assign any benefits" or "legal claims based on a denial of benefits," excepting assignments for "surprise bill[s]" and bills for "Emergency Services," Plan at 112 — defined terms that do not apply for all the reasons set forth above.

### 3.  Plaintiffs Have Not Alleged Facts Supporting Consent, Estoppel, or Waiver of the Anti-Assignment Provision

Third, Plaintiffs argue that at least an "issue of fact has been raised as to whether [Anthem] either consented to the assignment or, at the very least, waived its enforcement."  Opp. at 2; *see id.* at 6-8.  In the alternative, Plaintiffs argue that Anthem should be estopped from enforcing the anti-assignment clause.  *Id.* at 9-10.

As a threshold matter, there are no allegations in the Complaint that Anthem expressly consented to the assignment and, in any event, the Plan's anti-assignment clause is not of the variety that allows for assignment with the consent of the insurer, such as can be found in other policies.  Rather, the anti-assignment clause here categorically prohibits assignment, except for in limited express circumstances which, as set forth above, have not been pleaded here.  *See* Plan at 112.

The Court therefore turns to the question of whether Plaintiffs have adequately pleaded facts that support the waiver of, or estop Anthem from relying on, an otherwise unambiguous

anti-assignment clause. "Although the Second Circuit has not yet addressed whether a healthcare company may be estopped from relying on or waive its right to enforce an anti-assignment provision, it has found the equitable doctrines of estoppel and waiver are applicable to ERISA actions." *Merrick*, 175 F. Supp. 3d at 120 (collecting cases). Because the doctrines implicate different concerns and principles, the Court addresses waiver and equitable estoppel separately, but applies federal common law in both instances. *See, e.g.*, *Ludwig v. NYNEX Serv. Co.*, 838 F. Supp. 769, 796 (S.D.N.Y. 1993) ("[T]he doctrine of waiver is applicable to ERISA cases as a matter of federal common law . . . ."); *id.* at 793 ("[T]he Second Circuit Court of Appeals has 'recognized that under "extraordinary circumstances" principles of estoppel can apply in ERISA cases' under the veneer of federal common law." (citing *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993))).

### i. Waiver

According to Plaintiffs, Anthem effectively waived its right to enforce the anti-assignment provision through its "direct dealings with the Practice." Compl. ¶ 90; *see also id.* ¶¶ 84-95. The waiver of a right must be "voluntary and intentional." *Da Silva Plastic & Reconstructive Surgery, P.C. v. Empire HealthChoice HMO, Inc.*, No. 22-cv-07121 (NCM) (JMW), 2025 WL 240917, at *10 (E.D.N.Y. Jan. 17, 2025) (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 585 (2d Cir. 2006)). It "requires a 'clear manifestation of an intent by a party to relinquish its known right' and 'mere silence, oversight, or thoughtlessness in failing to object to a breach of the contract' are insufficient." *Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc.*, No. 16-cv-05265 (JPO), 2019 WL 1409806, at *10 (S.D.N.Y. Mar. 28, 2019) (alterations adopted) (quoting *Beth Israel*, 448 F.3d at 585).

To argue waiver, Plaintiffs assert that, in addition to making direct payments to the Practice, Anthem "authorized the procedures, confirmed the benefits under the Plan," and "provid[ed] pre-authorization for all requested surgical codes involved in the patient's scheduled procedures." Opp. at 6-7. Anthem undertook these measures, Plaintiffs contend, while "fully informed . . . that the Practice had obtained an assignment of benefits from the beneficiary at issue." Opp. at 7. Plaintiffs' Complaint also underscores the Practice's engagement in the administrative appeals process and the fact that Anthem provided the Practice with "appeal responses" and "appeal determinations." Compl. ¶ 95; *see also id.* ¶¶ 43-57, 94.[9] Based on these dealings, Plaintiffs assert that there was a "regular, routine course of conduct between [Anthem] and the Practice in which [Anthem] recognized the assign[ment] and dealt directly with the Practice." Opp. at 7-8.

To the extent Plaintiffs rely on Anthem's direct payments to the Practice to argue waiver, the Court rejects that argument. In *McCulloch Orthopaedic Surgical Services, PLLC v. Aetna Inc.*, the Second Circuit addressed the separate question of complete preemption under ERISA Section 502, which requires the court to determine first whether a plaintiff has standing to proceed under ERISA. 857 F.3d at 147-48 ("The first prong of the [preemption inquiry] . . . requires that we must assess whether a party has standing to pursue an ERISA claim."). The court held that the plaintiff's "acceptance of an assignment was ineffective" and a "legal nullity" given the "plain language" of the plan's anti-assignment clause, and therefore the plaintiff did not have standing to sue under ERISA. *Id.* at 147. While an anti-assignment clause may be

---

[9] Plaintiffs notably do not rely on the Practice's participation in the administrative appeals process to argue waiver in their opposition papers, instead focusing on Anthem's "explanation of benefits, partial payments, requests for supporting medical records and documentation, clinical notes, and requests for other claim information." Opp. at 7. However, the Court will consider it for purposes of this motion.

rendered unenforceable through waiver or otherwise, the Second Circuit held that the anti-assignment clause was operative and barred the provider from pursuing an ERISA claim — notwithstanding Aetna's correspondence with, and direct payments to, the healthcare provider. *Id.* at 144, 147 n.3. For that reason, other courts in this Circuit have interpreted *McCulloch* as "implicitly reject[ing]" the argument that partial payment voids an anti-assignment provision. *Shuriz Hishmeh, M.D., PLLC v. Aetna Health Inc.*, No. 16-cv-05736 (JS) (ARL), 2017 WL 4271449, at *2 (E.D.N.Y. Sept. 25, 2017); *see also Neurological Surgery*, 511 F. Supp. 3d at 286 (observing that "[t]he *McCulloch* holding came in the face of its recitation of facts, which detailed the defendants' partial payments to and communications with the plaintiff").

Many other courts have likewise found that direct payments do not effectuate waiver. *See, e.g.*, *Travelers Co.*, 243 F. Supp. 3d at 330 ("[D]irect payment would not constitute a waiver of the provisions unequivocally preventing a Plan member / beneficiary from assigning to any third party his right to sue." (citing *Merrick*, 175 F. Supp. 3d at 122-26)); *Mbody*, 2014 WL 4058321, at *3 (rejecting the argument that "defendants waived the anti-assignment provisions by providing direct payment to plaintiffs" because "[h]ealth insurance companies routinely make direct payments to healthcare providers without waiving anti-assignment provisions"); *Med. Soc'y of N.Y.*, 2019 WL 1409806, at *10-11 ("[I]n a number of cases from this District and beyond, courts have rejected the argument that an administrator 'waived the anti-assignment provision by its direct payment to providers' where the administrator 'was explicitly permitted to pay providers directly under the plan in its discretion.'" (alterations adopted) (quoting *Merrick*, 175 F. Supp. 3d at 122)).

Courts are particularly disinclined to find waiver based on direct payments where — as here — the terms of the plan otherwise authorize the administrator to make payments directly to

the provider.  The Plan includes a provision which provides that, "[i]f [a beneficiary] receive[s] services from a Non-Participating Provider, [Anthem] reserve[s] the right to pay either the Subscriber or the Provider."  Plan at 116.  "To give fullest effect" to both the anti-assignment provision and the provision authorizing direct payments, "the plan administrator should be allowed 'to exercise its expressly reserved discretion to pay out-of-network providers directly, without relinquishing its right to enforce an express restriction on assignment of benefits.'" *Superior Biologics NY, Inc. v. Aetna, Inc*., No. 20-cv-05291 (KMK), 2022 WL 4110784, at \*9 (S.D.N.Y. Sept. 8, 2022) (quoting *Med. Soc'y of N.Y*., 2019 WL 1409806, at \*11).

The Court is aware that some cases in this District have reached different conclusions as to whether direct payments can effectuate waiver of an anti-assignment clause; those cases, however, are in the minority and driven by two older cases: *Neuroaxis Neurosurgical Associates, PC v. Cigna Healthcare of New York, Inc*., No. 11-cv-08517 (BSJ) (AJP), 2012 WL 4840807 (S.D.N.Y. Oct. 4, 2012), and *Biomed Pharmaceuticals, Inc. v. Oxford Health Plans (NY), Inc*., No. 10-cv-07427 (JSR), 2011 WL 803097 (S.D.N.Y. Feb. 18, 2011).  *See Neurological Surgery*, 511 F. Supp. 3d at 287 ("In the past ten years only two courts in the Second Circuit have held that a 'long-standing pattern and practice of direct payment . . . suffic[es] to show [defendant's] consent to [plaintiff's] assignments,' and both of those cases pre-date *McCulloch*." (alterations and omissions in original) (quoting *Cigna*, 2012 WL 4840807, at \*3) (citing *Biomed*, 2011 WL 803097, at \*5)).  Neither persuades the Court that facts supporting waiver have been pleaded here.  The plan at issue in *Biomed* included a provision stating that, if a beneficiary wanted the insurer "to pay the provider directly (*referred to as assignment*), [the beneficiary] must give the provider a blank claim form to be completed and forwarded with the itemized bill," *id.* (emphasis added) — thereby suggesting patients could unilaterally assign their rights to benefits to

providers, without Oxford's consent.  The court found that, notwithstanding the plan's

incorporation of an anti-assignment clause, this provision "either expressly authorize[d] patients

to assign their claims to healthcare providers without Oxford's consent or, at the very least,

create[d] an ambiguity within the contract that should be construed against the drafter."  2011

WL 803097, at *5.  "Given this ambiguity," the *Biomed* court found that Oxford's "long-term

pattern and practice of accepting and paying on Biomed's direct billing" estopped Oxford from

relying on the anti-assignment provision.  *Id.*

   *Cigna*, which Plaintiffs rely upon, in turn cites to *Biomed* for the proposition that a

defendant's "long-standing pattern and practice of direct payment to [the plaintiff] is sufficient to

show its consent to [the plaintiff's] assignments."  *Cigna*, 2012 WL 4840807, at *3 (citing

*Biomed*, 2011 WL 803097, at *5).  However, as other courts have observed, *Cigna*'s articulation

of *Biomed*'s holding "omitted the phrase, '[g]iven this ambiguity' therefrom, thus broadening the

holding of *Biomed* without explanation."  *Angstadt v. Empire HealthChoice HMO, Inc.*, No. 15-

cv-01823 (SJF) (AYS), 2017 WL 10844692, at *5 n.5 (E.D.N.Y. Mar. 16, 2017) (alteration in

original); *accord Neurological Surgery*, 511 F. Supp. 3d at 287.  Since there is no basis to find

the anti-assignment provision in this case ambiguous, *Biomed* is inapposite, and *Cigna*'s

unreasoned extrapolation of *Biomed's* holding is unpersuasive.  This is especially so because, as

discussed above, the Plan here permits payments to be made directly to the provider.[10]  In any

event, because the weight of more recent authority, including *McCulloch*, cuts the other way on

---

[10] Plaintiffs also cite to *Neurological Surgery, P.C. v. Oxford Health Plans (NY), Inc.*, No. 18-cv-
00560 (GRB), 2020 WL 13931876 (E.D.N.Y. Oct. 30, 2020).  This case relied solely on *Cigna*
in finding that the insurer's pattern of direct payments to the plaintiff-provider suggested a
waiver of the plan's anti-assignment clause.  *Id.* at *8.  For the reasons set forth above, the court
deems *Cigna* unpersuasive.  Moreover, unlike here, the plan at issue in *Oxford Health* did not
contain language otherwise permitting direct payments to the provider.  *Id.*

this issue, the Court declines to follow *Biomed* and *Cigna*. *See, e.g.*, *Merrick*, 175 F. Supp. 3d at

123 (acknowledging *Biomed* and *Cigna* but "find[ing] more persuasive those decisions that give

effect to the plain language of anti-assignment provisions"); *Neurological Surgery*, 511 F. Supp.

3d at 287 ("In the absence of more persuasive authority [than *Cigna* and *Biomed*], Aetna's

history of payment to Plaintiff does not override the unambiguous anti-assignment provision in

the ERISA plans."); *Da Silva*, 2025 WL 240917, at *10 ("Courts in this Circuit 'have repeatedly

rejected arguments that a health plan's communications with and payments to medical providers

constitute a waiver of anti-assignment provisions.'" (ellipses omitted) (quoting *Gordon Surgical

Grp., P.C. v. Empire HealthChoice HMO, Inc.*, 724 F. Supp. 3d 158, 190 (S.D.N.Y. 2024))).

The Court finds more persuasive those authorities that defer to the unambiguous language of the

benefit plans themselves.

　　　　Plaintiffs insist, however, that "[t]he facts here go beyond mere direct payments." Opp.

at 6. Plaintiffs point to a "regular, routine course of conduct" between Anthem and the Practice,

including conduct such as preauthorization, "explanation of benefits, partial payments, requests

for supporting medical records and documentation, clinical notes, and requests for other claim

information." *Id.* at 7-8. "[W]hile evidence of an administrator's course of conduct apart from

direct payments, including communications and conduct regarding benefit appeals, can present a

'closer question' as to waiver," *Redstone v. Empire Healthchoice HMO, Inc.*, No. 23-cv-02077

(VEC), 2024 WL 967416, at *5 (S.D.N.Y. Mar. 5, 2024) (quoting *Merrick*, 175 F. Supp. 3d at

123), the pleaded course of dealings between Anthem and the Practice still does not raise a

plausible inference of waiver. Nothing in the cited correspondence between the Practice and

Anthem suggests that Anthem engaged with the Practice as the Patient's assignee or otherwise

intentionally waived the anti-assignment clause. *See generally* Compl. ¶¶ 22-33; 43-57.

Although Plaintiffs allege that the HCFA 1500 Form they submitted to Horizon for reimbursement "informed Horizon (and [Anthem]) that the Practice had an assignment-of-benefits on file for [the Patient]," *id.* ¶ 39, courts have held that "communications between . . . parties, *even with defendants' awareness of active anti-assignment clauses*," do not "plausibly suggest waiver." *Da Silva*, 2025 WL 240917, at *10 (emphasis added).  For instance, in *McCulloch*, the Second Circuit deemed an anti-assignment clause enforceable even though the provider submitted a claim form to Aetna that stated that the provider accepted assignment.  857 F.3d at 144.  Plaintiffs contend that the fact that "Empire never raised any objection to the Practice's . . . claimed status as a beneficiary" means that "Empire . . . deliberately and freely chose to honor the assignment."  Opp. at 7.  But it is well-established that an insurer's "[m]ere silence regarding [an] anti-assignment provision" is insufficient to constitute waiver, *Travelers Co.*, 243 F. Supp. 3d at 330, as is an insurer's failure to affirmatively raise the anti-assignment provision during correspondence with a provider, *see*, *e.g.*, *Neurological Surgery*, 511 F. Supp. 3d at 286 ("[T]hough Aetna 'never once' pointed to the anti-assignment language to 'deny or underpay any claim,' Aetna's inaction does not constitute waiver." (alterations adopted)); *Mbody*, 2014 WL 4058321, at *3 ("That defendants did not raise the anti-assignment provision at the time they denied or reduced payment is irrelevant because the anti-assignment provision was not a factor [in] determining the payment amount.  Plaintiffs' argument is simply another way of re-arguing that defendants waived the anti-assignment provision by making direct payments to plaintiffs — an argument courts have repeatedly rejected."); *Superior Biologics*, 2022 WL 4110784, at *10 ("Even if Aetna never raised the anti-assignment provision in its communications with Plaintiff, the caselaw suggests, and the Court agrees, these communications do not suggest that Aetna intended to waive its rights under the provision.");

*Med. Soc'y of N.Y.*, 2019 WL 1409806, at *12 ("United's 'mere silence' in the face of a request to reaffirm the anti-assignment cannot effectuate waiver." (quoting *Beth Israel*, 448 F.3d at 585)).  This line of cases comports with federal common law, which requires that any waiver must be undertaken intentionally and voluntarily.  *Ludwig*, 848 F. Supp. at 796.

  As for allegations that the Practice engaged in the administrative appeals process, at bottom, the facts pleaded in the Complaint amount to little more than Anthem acknowledging receipt of the various appeals and rendering a determination that the reimbursement amount remained valid.  *See, e.g.*, Compl. ¶¶ 43-57.  That does not rise to an intentional and voluntary relinquishment of Anthem's rights vis-à-vis the anti-assignment clause.  *See, e.g.*, *Merrick*, 175 F. Supp. 3d at 125 ("While [the provider] appealed some of the alleged overpayments identified by United, the only allegations regarding the parties' communications were that United acknowledged an appeal was filed but determined that the overpayment request remained valid." (internal quotation marks omitted)).  Moreover, that Anthem continued to direct correspondence to the Patient further weighs against finding waiver here.  *See* Compl. ¶ 47.

  Indeed, courts in this District have routinely found similar conduct insufficient to give rise to a plausible inference of waiver even at the motion to dismiss stage.  *See, e.g.*, *Redstone*, 2024 WL 967416, at *5 (finding inadequate complaint's "allegations of waiver through regular interaction and communication," including "sending a copy of the pre-authorization letters to Plaintiffs," "informing Plaintiffs of the benefits under the Plan," and "authoriz[ing] the Plaintiffs to act as [the patient's] representative to carry out any grievance, appeal, or other external review of Empire's reimbursement decisions" (internal quotation marks omitted)); *Angstadt*, 2017 WL 10844692, at *6 ("[T]he fact that defendants communicated with plaintiffs, and responded to their appeals, does not estop defendants from enforcing the applicable anti-assignment provision,

nor constitute a waiver of defendants' rights under the anti-assignment provision."); *Superior Biologics*, 2022 WL 4110784 at *8-9 (rejecting argument that insurer waived anti-assignment provisions based on insurer's "silence regarding the anti-assignment provisions during the claims processing or appeals process, [the insurer's] direct communications with [p]laintiff before its provision of service and during the processing and payment of claims, and its allowance of [p]laintiff to submit claims on behalf of its patients"); *Merrick*, 175 F. Supp. 3d at 120-26 (declining to find estoppel or waiver of anti-assignment clause based on supposed "long-standing pattern and practice" of direct payment and other correspondence between insurer and provider, including provider's appeal of claim); *Gordon Surgical Grp.*, 724 F. Supp. 3d at 190 (rejecting argument that defendants' correspondence with plaintiffs, including "written explanations of benefits, partial payments, requests for supporting records, appeal responses, and appeal determinations," constituted a "full and enforceable waiver" of the anti-assignment clauses).[11]

---

[11] Plaintiffs' efforts to distinguish Anthem's cited authorities are unpersuasive. Plaintiffs argue that the "pattern and practice of direct communications and payments between Empire and the Practice" distinguishes this case from *Angstadt v. Empire HealthChoice HMO, Inc.*, because *Angstadt* involved only "a longstanding pattern and practice of direct payment, *without more*." Opp. at 7 n.3. This misconstrues *Angstadt*, which focused not only on direct payments, but also acknowledged that "defendants communicated with plaintiffs" and "responded to their appeals." 2017 WL 10844692, at *6. *Angstadt* found that even this additional correspondence between the provider and defendants "[did] not estop defendants from enforcing the applicable anti-assignment provision, nor constitute a waiver of defendants' rights under the anti-assignment provision." *Id.* And although *Shuriz Hishmeh M.D. PLLC v. Empire Health Choice Assurance, Inc.* involved only "one direct payment," Opp. at 7 n.3, the court's analysis focused on the "the language in Defendant's Plan," which "permit[ted] Defendant to 'make payments directly to Providers for Covered Services,'" — in other words, "Defendant was 'explicitly permitted to pay Plaintiff directly under the Plan' without waiving the anti-assignment provision." 2020 WL 4452112, at *4 (quoting *Merrick*, 175 F. Supp. 3d at 122). The same is true here. In any event, Plaintiffs overlook the still many other cases, cited *supra*, that have similarly held that a "pattern and practice" of direct communications and payments is not sufficient to waive or estop the application of an unambiguous anti-assignment clause. *See, e.g.*, *Superior Biologics*, 2022 WL 4110784, at *8-9; *Redstone*, 2024 WL 967416, at *5; *Merrick*, 175 F. Supp. 3d at 120; *Gordon Surgical Grp.*, 724 F. Supp. 3d at 190.

Plaintiffs next argue that Anthem waived any application of the Plan's anti-assignment clause in this case by granting the Practice a Gap exception, thereby effectively agreeing to treat the Practice as an in-network provider and rendering the anti-assignment clause inapplicable. Compl. ¶ 87 ("Accordingly, by granting [the Practice] in-network status — and not raising the anti-assignment clause during the process of granting the Gap exception — [Anthem] waived any application of the Plan's anti-assignment clause in this case."); *see id.* ¶¶ 84-87. However, even drawing all inferences in Plaintiffs' favor, Plaintiffs have not pleaded any facts from which this Court can conclude that Anthem in fact granted the Gap exception. Plaintiffs allege only that they sought a Gap exception and that Anthem requested, and Plaintiffs subsequently submitted, documentation to establish the medical necessity of the services provided. *Id.* ¶¶ 24-25. The Complaint later states that, "as alleged above," Anthem "granted" the Practice a Gap exception, but no such allegations appear in the Complaint and the later statement that the exception was granted is therefore wholly conclusory. *Id.* ¶¶ 62, 85. In any event, for the reasons set forth above, even if the Gap exception were granted, that would not impact the enforcement of the anti-assignment clause. *See supra* pp. 15-16.[12]

---

[12] Plaintiffs also allege that, by "granting the Gap exception, [Anthem] has agreed to treat the Practice, for these services, as an in-network provider," and that such providers are "paid directly by [Anthem] without the need to obtain an assignment of benefits from the enrollee." Compl. ¶ 86. While in-network providers might not need an assignment of benefits to receive direct payments from Anthem, they would still not be able to bring suit for the wrongful denial of benefits under the Plan without an assignment of legal claims. The granting of a Gap exception therefore would not obviate the need for an assignment from the beneficiary in order to seek legal redress under Section 502. *See, e.g.*, *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 259 (2d Cir. 2015) ("Healthcare providers are not 'beneficiaries' of an ERISA welfare plan by virtue of their in-network status or their entitlement to payment."); *Med. Soc'y of N.Y.*, 2019 WL 1409806, at *11 ("Even if United could be said to have waived its objection to a patient's assigning to a service provider the right to receive direct payment for services, this does not necessarily constitute a clear manifestation of the intent to allow a plan beneficiary to assign the right to contest the denial of a benefits claim through internal appeals or in federal court.").

Finally, the Court declines to follow decisions that have applied state law, rather than federal common law, to evaluate waiver and/or estoppel.  *Cf. DeMaria v. Horizon Healthcare Servs., Inc.*, No. 11-cv-07298, 2015 WL 3460997, at *8 (D.N.J. June 1, 2015) (applying New Jersey contract law, which provides that "a party may waive an anti-assignment provision via a course of dealing that renders the anti-assignment provision inequitable"); *Premier Health Ctr. P.C. v. UnitedHealth Grp.*, No. 11-cv-00425, 2012 WL 1135608, at *9 (D.N.J. Apr. 4, 2012) (observing that New Jersey courts "have held that an anti-assignment clause may be waived by a written instrument, a course of dealing, or even passive conduct, *i.e.*, taking no action to invalidate the assignment vis-à-vis the assignee" (internal quotation marks omitted)); *Gregory Surgical Servs., LLC v. Horizon Blue Cross Blue Shield of N.J., Inc*., No. 06-cv-00462, 2007 WL 4570323, at *4 (D.N.J. Dec. 26, 2007).

Federal common law requires adhering to the express terms of an unambiguous ERISA plan.  Indeed, in declining to follow the above-cited line of out-of-District authorities, *Merrick* observed that *Premier Health Center* "applied New Jersey Law, not federal law," and that the latter "requires giving effect to the plain language of the plan."  *Merrick*, 175 F. Supp. 3d at 125. Because there is no ambiguity in the Plan's anti-assignment language, the Court finds no basis for "read[ing] additional terms into the contract."  *Id.* at 122 (quoting *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 137 (2d Cir. 2001)); *see id.* ("[U]nambiguous language in an ERISA plan must be interpreted and enforced according to its plain meaning [and w]hen the language of an ERISA plan is unambiguous, [the court] will not read additional terms into the contract." (alterations in original)  (quoting *Connors*, 272 F.3d at 137)).

Anthem's communications with the Practice were entirely consistent with the Plan's terms.  The Plan requires preauthorization for certain procedures, Plan at 50, authorizes direct

payments to participating providers, *id.* at 116, authorizes non-participating providers to submit claim forms directly to Anthem, *id.* at 90, and allows beneficiaries to appoint designees to represent them during the appeals process, *id.* at 92 — all conduct Plaintiffs point to in arguing that Anthem waived its right to nonassignment of a beneficiary's benefits and claims under the Plan.   Based on the facts pleaded, and where the parties' course of dealings is consistent with the Plan's express terms, there is no basis for applying waiver or estoppel principles to vary the contract's otherwise clear anti-assignment language. *See, e.g., N. Jersey Plastic Surgery Ctr.*, *LLC v. 1199SEUI Nat'l Benefit Fund*, No. 22-cv-06087 (PKC), 2023 WL 5956142, at *11 (S.D.N.Y. Sept. 13, 2023) ("[C]ourts in this Circuit have repeatedly rejected . . . waiver arguments by plaintiff providers at the motion to dismiss stage" premised upon "partial or direct payments to providers, direct communications between the parties, and a defendant's failure to object to an attempted assignment, including during an appeals process."); *cf. Jeffrey Farkas, M.D., LLC v. Grp. Health Inc.*, No. 18-cv-08535 (CM) (KHP), 2019 WL 657006, at *1, *8 (S.D.N.Y. Feb. 1, 2019) (finding that plaintiffs could amend to plead a non-futile claim of waiver of an anti-assignment clause where, unlike here, the health benefit plan "cover[ed] in-network benefits only" such that any direct payments to the provider or other correspondence between the provider and the insurer would not have been pursuant to the terms of an ERISA plan).

In sum, for all the aforementioned reasons, the Court concludes that Plaintiffs have not plausibly pleaded that Anthem waived the Plan's express anti-assignment clause.

### ii.  Equitable Estoppel

Plaintiffs next assert that Anthem is estopped from enforcing any anti-assignment provision because Anthem preauthorized the surgical procedures, confirmed plan benefits, and "assur[ed] the Practice of the rate of reimbursement all beforehand."  Opp. at 9-10.  "[P]rinciples

of estoppel can apply in ERISA cases under extraordinary circumstances." *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 78 (2d Cir. 1996).  "To establish estoppel in an ERISA action, a party must sufficiently allege '(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced, and, as stated, must adduce [] . . . facts sufficient to [satisfy an] "extraordinary circumstances" requirement as well.'" *Merrick*, 175 F. Supp. 3d at 121 (alterations and omission in original) (quoting *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 109 (2d Cir. 2008)).

        No "extraordinary circumstances" exist here that would justify estopping the application of the anti-assignment provision.  Plaintiffs assert that "[Anthem] was well aware that the Practice would rely on [Anthem's] promises," including Anthem's supposed "promise of a definite rate of reimbursement."  Opp. at 10.  This assertion, however, finds no support in the Complaint, which reflects that Anthem in fact declined to agree to an up-front reimbursement amount, instead twice informing the Practice that Anthem's policy was to negotiate single case agreements after the out-of-network provider had rendered services.  Compl. ¶¶ 26-28. Therefore, notwithstanding Plaintiffs' protestations otherwise, the Complaint contains no allegations regarding any "promise" made by Anthem with respect to a "definite rate of reimbursement."  Opp. at 10.  Plaintiffs have otherwise "fail[ed] to allege intentional inducement or deception" by Anthem or "any other conduct that may be considered 'beyond the ordinary.'" *Merrick*, 175 F. Supp. 3d at 121 (quoting *Ramos v. SEIU Loc. 74 Welfare Fund*, No. 01-cv-02700 (SAS), 2002 WL 519731, at *6 (S.D.N.Y. Apr 5, 2002)); *see also Mbody*, 2016 WL 2939164, at *5 ("[T]he plaintiffs have not established that administrative appeals or the communication sent to the defendants constituted any sort of promise that overrode the

unambiguous language of the Governing Plans.  Accordingly, the defendants are not estopped from relying on the Governing Plans' anti-assignment provisions.").

The Court is particularly reluctant to apply estoppel principles here given the absence of any ambiguity in the Plan's anti-assignment language.  Quoting the Sixth Circuit in *Riverview Health Institute LLC v. Medical Mutual of Ohio*, the court in *Neuroaxis Neurosurgical Associates, PC v. Costco Wholesale Co.* explained that estoppel should not be applied to vary the terms of unambiguous plan provisions:

> Principles of estoppel cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions.  There are at least two reasons for this.  First, as we have seen, estoppel requires reasonable or justifiable reliance by the party asserting the estoppel.  That party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party.  Second, to allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves.  That would not be consistent with ERISA.

919 F. Supp. 2d at 356 (quoting *Riverview Health Inst. LLC, v. Med. Mut. of Ohio*, 601 F.3d 505, 521 (6th Cir. 2010)).  For the same reasons, the Court finds that estopping Anthem from relying on the Plan's straightforward anti-assignment clause based on the facts pleaded would be contrary to the principles governing estoppel and inconsistent with ERISA's "focus on the written terms of the plan."  *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013); *see also US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013) ("The plan, in short, is at the center of ERISA."); *see also Mbody*, 2016 WL 2939164, at *5 ("[T]he plaintiffs have not established that administrative appeals or the communications sent to the defendants constituted any sort of promise that overrode the unambiguous language of the Governing Plans.").

Thus, Plaintiffs have not pleaded facts sufficient to draw a plausible inference that Anthem is estopped from enforcing the Plan's express anti-assignment provision.[13]

### C.  Plaintiffs' Request for Discovery on Consent Is Denied

Finally, Plaintiffs argue that even if the Court finds they have not adequately pleaded consent to or waiver of the anti-assignment clause, they are entitled to "focused discovery to establish that [Anthem] consented to assignment."  Opp. at 8.  The Court does not agree.

First, Plaintiffs "do not allege that they sought and received consent."  *Merrick*, 175 F. Supp. 3d at 119 n.13.  Instead, Plaintiffs' theory of waiver is based on Anthem's "direct payment to and course of conduct with Plaintiffs."  *Id.*  Second, the anti-assignment clause here does not permit assignment even with consent.  This distinguishes this case from those authorities cited by Plaintiffs that granted targeted discovery on consent.  For example, in *Neuroaxis Neurosurgical*, the court allowed "targeted discovery to show that Aetna provided consent for Neuroaxis to obtain assignments of claims from Plan members under Plans containing Consent Clauses."  919 F. Supp. 2d at 354.  *Neurological Surgery v. Oxford Health Plans* likewise allowed discovery to

---

[13] While not raised in Plaintiffs' opposition papers, the Complaint also alleges that the Practice has standing to pursue its federal ERISA claim as "authorized representatives" of the Patient. *See* Compl. ¶ 106.  This argument is without merit.  "Courts in the Second Circuit have held that a medical provider's status as an authorized representative does not negate an unambiguous anti-assignment provision, nor does it provide an independent cause of action under ERISA § 502(a)(1)(B)."  *Superior Biologics*, 2022 WL 4110784, at *11 (collecting cases); *see also Mbody*, 2016 WL 2939164, at *6 ("[T]he plaintiffs 'authorized representative' theory of standing also fails because of the unambiguous anti-assignment provisions of the Governing Plans.").  ERISA's statutory language authorizes civil suits by only a limited pool of plaintiffs, of which authorized representatives are not a part.  *See, e.g.*, *Med. Soc'y of N.Y.*, 2017 WL 4023350, at *7 ("ERISA 'unambiguously provides that a civil action . . . may be brought "by a participant, beneficiary, or fiduciary,"' and 'courts have consistently read this provision as strictly limiting the universe of plaintiffs who may bring civil actions.'" (quoting *Am. Psychiatric Ass'n*, 821 F.3d at 360)); *see also* 29 U.S.C. § 1132(a)(3).  Therefore, "[a]bsent a valid assignment" of the Patient's claims, Anthem "lacks a cause of action under ERISA."  *Med. Soc'y of N.Y.*, 2017 WL 4023350, at *7.

"establish whether the Defendant consented to assignments" under the Plan's "[a]ssignment with [c]onsent" clause. 2020 WL 13931876, at *8. Plaintiffs have not referenced — and indeed, the Court is not aware of — any cases that have allowed targeted discovery as to consent where the anti-assignment clause at issue did not incorporate a consent carveout.

\*          \*          \*

For all the foregoing reasons, the Court finds that the Plan's anti-assignment language is enforceable and that Plaintiffs' ERISA claim must be dismissed. *See Neuroaxis Neurosurgical Assocs.,* 919 F. Supp. 2d at 351-56 (holding that the purported assignments of claims accruing under health benefit plans with anti-assignment provisions that prohibit assignments except for in limited circumstances or as specifically provided by the plans were invalid because plaintiff did not fall within those limited circumstances, and thus not considering waiver or estoppel).[14]

## II.    State Law Claims

Having dismissed Plaintiffs' ERISA claim, the Court now turns to Plaintiffs' state law claims for breach of an implied-in-fact contract and unjust enrichment.

---

[14] "Anti-assignment provisions place out-of-network providers in the unenviable position of having to 'bill[] the beneficiary directly' and, should payment not be forthcoming, of having either to 'rely on the beneficiary to maintain an ERISA suit' or to sue the beneficiary directly." *Plastic Surgery Ctr.*, 967 F.3d at 228 (alteration in original) (quoting *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 179 (3d Cir. 2014)). Nevertheless, the Court is bound by ERISA's statutory language, which provides a cause of action only for plan "participant[s] or beneficiar[ies]," 29 U.S.C. § 1132(a)(1), as well as by federal common law principles that require adherence to the express terms of an ERISA plan that includes an enforceable anti-assignment clause. *Cf.* Jordan Davis, Note, *Seeking a Second Opinion: A Call for Congressional Evaluation of Anti-Assignment Provisions in Employee Health Plans*, 89 Fordham L. Rev. 2265, 2296-99 (2021) (proposing congressional reforms to ERISA, including expanding Section 502(a) to provide a private cause of action for out-of-network providers, in addition to participants and beneficiaries).

### A. Preemption

Defendants first argue that Plaintiffs' state law claims are expressly preempted by ERISA. Mot. at 13-15. "ERISA Section 514(a) provides that ERISA supersedes or preempts all state laws insofar as they 'relate to any employee benefit plan.'" *Park Ave. Podiatric Care, P.L.L.C. v Cigna Health & Life Ins. Co.*, Nos. 23-1134, 23-1135, 2024 WL 2813721, at *2 (2d Cir. June 3, 2024) (summary order) (quoting 29 U.S.C. § 1144(a)). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Paneccasio*, 532 F.3d at 114 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983)). "A claim under state law is not independent of ERISA if the terms of a benefit plan are 'an essential part' of the claim, and liability would exist only because of the administration of an ERISA-regulated benefit plan." *Redstone*, 2024 WL 967416, at *6. "The Supreme Court has explained that this means ERISA . . . preempts state common law claims that seek to rectify 'alleged improper processing of a claim for benefits under' ERISA-regulated plans." *Park Ave. Podiatric Care*, 2024 WL 2813721, at *2 (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48 (1987)). ERISA also preempts state laws that "seek 'to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent of ERISA.'" *Paneccasio*, 532 F.3d at 114 (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004)).

With respect to Plaintiffs' implied-in-fact contract claim, Plaintiffs allege that the parties had an implied contract "regarding the provision of, and corresponding payment for, the medically necessary, covered health care services that the Practice provided . . . based on the parties' course of dealings and pattern of conduct." Compl. ¶ 112; *see id.* ¶¶ 112-115. Although not entirely clear from the face of the Complaint, Plaintiffs appear to infer an implied-in-fact

contract from Anthem's description of the Patient's benefits under the Plan and preauthorization

of the Patient's procedures. But any alleged "implied contract" between the parties does not

exist independently of the Plan's terms and the coverage provided for thereunder. The Plan

provides for coverage of out-of-network services, albeit at a reduced rate of reimbursement, and

therefore dictates the appropriate rate of reimbursement for out-of-network providers like the

Practice. Plan at 4. The Plan also requires the preauthorization that was obtained here. Plan at

50. Courts routinely find claims sounding in breach of contract preempted under similar

circumstances. *See, e.g.*, *Neurological Surgery*, 511 F. Supp. 3d at 289 ("The pre-authorization,

pre-certification, or other requirements provided to Aetna before Plaintiff rendered medically

necessary, covered health services do not create a legal duty independent of ERISA." (internal

quotation marks omitted)); *Redstone*, 2024 WL 967416, at *7 (breach of implied contract claim

preempted where it would not exist "but for the existence of Empire's payment obligations under

the ERISA plan" and "liability and damages . . . could not be ascertained without determining

the Plan's coverage and payment terms"); *Neurological Surgery, P.C. v. Siemens Corp.*, No. 17-

cv-03477 (ADS) (AKT), 2017 WL 6397737, at *5 (E.D.N.Y. Dec. 12, 2017) (observing that

courts have "expressly rejected" the argument that preauthorization gives rise to an "independent

contractual or quasi-contractual duty"); *N. Jersey Plastic Surgery Ctr.*, 2023 WL 5956142, at

*17 ("The Preauthorization, which was required by the terms of the [summary plan description],

does not give rise to a legal obligation independent of the plan.").[15] Therefore, any agreement

---

[15] Any argument that an implied contract as to the specific rate of reimbursement owed to the Practice arose from Anthem's preauthorization of the procedures is also refuted by the terms of the Plan. Under the Plan, "[p]reauthorization" does not confer a specific rate of reimbursement, but rather, is merely defined as a determination by Anthem prior to the beneficiary's receipt of a surgery that the surgery is "[m]edically [n]ecessary." Plan at 46.

between the Practice and Anthem arises from the insured's plan, which provides coverage for out-of-network providers and requires preauthorization.

Plaintiffs also claim that Anthem "granted" the Practice a Gap exception, *see* Compl. ¶¶ 62, 85, but for the reasons set forth above, Plaintiffs have not adequately pleaded facts to that effect. *See supra* at 27. Plaintiffs do not bring a promissory estoppel claim, and there are no allegations, for instance, that Anthem orally promised a Gap exception or otherwise indicated through its conduct that it would "gran[t] the Practice in-network level-of-benefits status for the claim at issue." *Id.* ¶ 60; *see, e.g.*, *Siemens Corp.*, 2017 WL 6397737, at *5 (state law claims preempted where plaintiffs were "unable to point to any written or oral contract" between the parties); *cf. McCulloch*, 857 F.3d at 150 (no preemption where promissory estoppel claim did not "implicate the terms of the plan" but was "instead . . . based on the Aetna representative's oral statements"); *Plastic Surgery Ctr.*, 967 F.3d at 237 (finding that state law claims were not preempted where plaintiff alleged that Aetna "must pay the costs of these services only because, and to the extent, it promised [plaintiff] that it would"). Plaintiffs' assertion that they were granted an in-network exception is belied by their own account of the parties' communications, which — as presently pleaded — reflects only that the Practice inquired about a Gap exception, and that Anthem in turn asked for documentation demonstrating the medical necessity of the procedures. Compl. ¶¶ 24-28. Therefore, to the extent Plaintiffs' implied contract claim relies upon Anthem's supposed pre-surgery representations regarding the availability of a Gap exception, Plaintiffs' pleadings are too conclusory for this Court to infer that the parties in fact had a freestanding agreement "independent and distinct" from Anthem's obligations to the Practice under the Plan. *McCulloch*, 857 F.3d at 150; *see also Redstone*, 2024 WL 5107437, at

*4 (deeming conclusory plaintiffs' assertion that they were entitled to an in-network exception).[16]

Plaintiffs' reliance on *McCulloch* is misplaced.  Opp. at 15-19.  The present action admittedly raises some of the same equitable concerns recognized by the Second Circuit in *McCulloch*: that is, that out-of-network insurers who, by virtue of invalid assignments, are barred from proceeding in federal court and simultaneously preempted from pursuing their state law claims in state court are effectively left without a remedy.  857 F.3d at 148.  But *McCulloch* is distinguishable in several important respects.  *McCulloch* concerned complete preemption under Section 502, not express preemption under Section 514.  *See* 857 F.3d 141 at 145-46.  The Court in *McCulloch* also did not address an implied-in-fact contract claim, but a promissory estoppel claim premised upon Aetna's oral promises of reimbursement made prior to the patient's surgery.  *Id.* at 150.  McCulloch alleged that Aetna represented that he would be reimbursed at 70 percent of the usual, customary, and reasonable ("UCR") rate for knee surgeries he performed on behalf of a patient who was a member of an Aetna-administered health care plan.  *Id.* at 144.  Aetna's representations regarding reimbursement therefore did "not implicate the actual coverage terms of the health care plan or require a determination as to whether those terms were properly applied by Aetna."  *Id.* at 149.  McCulloch's phone call with Aetna was also "not in furtherance of an ERISA plan," because McCulloch "was not required by the plan to pre-approve coverage for the surgeries that he performed."  *Id.* at 150-51.  Here, Plaintiffs do not allege that

---

[16] *Emergency Physician Servs. of N.Y. v. UnitedHealth Group,* cited by Plaintiffs, is inapposite because in that case, unlike here, the court found that "United's obligation to compensate Plaintiffs comes from, among other authorities, New York state law" requiring health care plans to pay a "reasonable" amount for emergency services rendered by non-participating physicians — a source independent from the underlying health benefit plan.  No. 20-cv-09183 (AJN), 2021 WL 4437166, at *8-9 (S.D.N.Y. Sept. 28, 2021) (citing N.Y. Fin. Serv. Law § 605(a)).

Anthem made oral promises or representations regarding reimbursement.  Instead, they ask the

Court to infer from the preauthorization and the parties' general communications before and after

the surgery that the parties had an implied-in-fact contract whereby Plaintiffs would receive a

specific rate of reimbursement that was set forth in the Plan.  Moreover, unlike *McCulloch*, the

Plan requires preauthorization, meaning that Plaintiffs' phone calls with Aetna were "in

furtherance of an ERISA plan," *id.* at 150, and "inextricably intertwined with the interpretation

of Plan coverage and benefits," *Montefiore*, 642 F.3d at 332.

Plaintiffs' unjust enrichment claim is also preempted.  "To prevail on a claim for unjust

enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the

plaintiff's expense; and (3) that equity and good conscience require restitution."  *Beth Israel*, 448

F.3d at 586 (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).  Plaintiffs allege that,

"[p]ursuant to the relevant health plan documents," Anthem "had an obligation to pay for

medically necessary services" such as those provided here, and that "[b]y not paying for

medically necessary claims, [Anthem] retained an improper benefit."  Compl. ¶ 124; *see id.* ¶¶

120-128.  "[W]hether a given unjust enrichment claim is preempted may turn on the nature of the

benefit: The claim will be preempted if that benefit 'is premised on . . . the existence of a[n

ERISA] plan' . . . ."  *Plastic Surgery Ctr.*, 967 F.3d at 240 (second alteration and first omission

in original) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990)).  Here, the

benefit conferred is plainly premised on the existence of the Plan, because "where a healthcare

provider claims unjust enrichment against an insurer, the benefit conferred, if any, is . . . the

discharge of the obligation the insurer owes to its insured."  *Id.* (footnote omitted).  That

obligation is in turn "none other than the insurer's duty to its insured *under the terms of the*

*ERISA plan*."  *Id.* at 241.  Therefore, Plaintiffs' unjust enrichment claim "require[s] the court [to]

find . . . that an ERISA plan exists, in order to demonstrate that" Anthem "received a benefit . . .
and that retention of that benefit without payment would be unjust." *Id.* (first omission in
original) (internal quotation marks omitted); *see also Jenkins v. Aetna Health, Inc.*, No. 23-cv-
09470 (KPF), 2024 WL 1795488, at *8 (S.D.N.Y. Apr. 25, 2024) (unjust enrichment claim
"cannot be said to rest on any separate and independent duty" because it "necessarily requires a
showing of a benefit to the insurer or administrator"); *Bassel v. Aetna Health Ins. Co. of N.Y.*,
No. 17-cv-05179 (EKR) (RER), 2018 WL 4288635, at *5 (E.D.N.Y. Sept. 17, 2019)
("[Plaintiffs'] unjust enrichment claim 'seek[s] "to rectify a wrongful denial of benefits promised
under ERISA-regulated plans, and do[es] not attempt to remedy any violation of a legal duty
independent of ERISA."'" (second and third alterations in original) (quoting *Paneccasio*, 532
F.3d at 114)); *Siemens Corp.*, 2017 WL 6397737, at *5 (unjust enrichment and implied contract
claims preempted by ERISA).

Plaintiffs' other cited authorities miss the mark.  In *Plastic Surgery Center, P.A. v. Aetna
Life Ins. Co.*, the plans at issue provided "no coverage . . . for services performed by an out-of-
network provider," and the plaintiff alleged that Aetna had orally represented it would provide
payment "at the highest in-network level."  967 F.3d 218, 231-32 (3d Cir. 2020) (alteration
adopted).  The court found that "Aetna's oral offers or oral promises . . . rather than the terms of
the plan" defined "the scope of Aetna's duty," meaning that the plans were "not 'critical factor[s]
in establishing liability.'"  *Id.* at 233 (alteration in original) (quoting *Ingersoll-Rand Co.*, 498
U.S. at 139-40).  In the absence of the parties' independent agreement, there would have been no
coverage for the out-of-network provider in *Plastic Surgery*.  Similarly, *Atlantic Neurosurgery
Specialists, P.A. v. Multiplan, Inc*. found that a provider's state law claims were not preempted
where the "insurance company's duties arose *solely*" from an alleged implied-in-fact contract

Case 1:24-cv-00866-JLR    Document 41    Filed 03/28/25    Page 40 of 45


between the parties. No. 20-cv-10685 (LLS), 2022 WL 158658, at *5 (S.D.N.Y Jan. 18, 2022) (emphasis added). Here, in contrast, there *is* express coverage for out-of-network providers under the Plan, albeit in amounts less than Plaintiffs desire. *See N. Jersey Plastic Surgery Ctr.*, 2023 WL 5956142, at *18 (distinguishing *Plastic Surgery* because "[u]nlike in this case . . . there was 'no coverage under the plans for services performed by an out-of-network provider,' 'no obligation for Aetna to pay the plaintiff for its services, and no agreement that compensation would be limited to benefits covered under the plan'" (alteration adopted) (quoting *Plastic Surgery Ctr.*, 967 F.3d at 231)).[17]

Plaintiffs nevertheless argue that their state law claims implicate only the "amount of payment" due under the terms of the Plan, not the "right to payment" in the first instance, and are therefore not preempted. Opp. at 18-19. The Second Circuit in *Montefiore* distinguished between claims implicating the "right to payment" and those involving only the "amount or execution of payment." 642 F.3d at 325 (emphasis omitted). *Montefiore* explained that claims involving the "right to payment" implicate "coverage and benefits established by the terms of the ERISA benefit plan," while "amount of payment" claims concern "the computation of contract payments or the correct execution of such payments." *Id.* at 331. "The former are said to constitute claims for benefits that can be brought pursuant to § 502(a)(1)(B), while the latter are

---

[17] The Court is also unpersuaded by Plaintiffs' reliance on *MC1 Healthcare, Inc. v. United Health Group, Inc.*, No. 17-cv-01909, 2019 WL 2015949, at *10 (D. Conn. May 7, 2019), and *Aesthetic & Reconstructive Breast Center, LLC v. United Healthcare Group, Inc.*, 367 F. Supp. 3d 1, 10-11 (D. Conn. 2019), because those courts found that promissory estoppel claims (in *MC1 Healthcare*, promissory estoppel and negligent misrepresentation claims) premised on oral promises made by the insured were not preempted. Plaintiffs have not brought a promissory estoppel claim and have instead brought breach of contract and unjust enrichment claims, both of which necessarily reference the terms of the Plan as pleaded. Finally, Plaintiffs' reliance on *Oxford Health* is misplaced, as the court there remanded state law claims under the complete preemption doctrine. 2020 WL 13931876, at *12.

typically construed as independent contractual obligations between the provider and the PPO or the benefit plan." *Id.* "In 'amount of payment' claims, 'the basic right to payment has already been established and the remaining dispute only involves obligations derived from a source other than the' ERISA plan." *N. Jersey Plastic Surgery Ctr.*, 2023 WL 5956142, at *20 (quoting *Neurological Surgery*, 511 F. Supp. 3d at 291). The "right to payment" / "amount of payment" dichotomy is ordinarily considered when assessing whether a claim constitutes a "colorable claim for benefits" under Section 502. *See, e.g.*, *Montefiore*, 642 F.3d at 331. Nevertheless, the "right to payment" / "amount of payment" framework may in some circumstances help elucidate whether a claim "relates" to an ERISA benefits plan for purposes of express preemption.

Plaintiffs raise two separate arguments for why Anthem's reimbursement was improper. Plaintiffs first plead that, because they were granted the Gap exception, they should have been treated as an in-network provider and the Patient should have been held responsible "only for any applicable in-network cost-sharing." Compl. ¶¶ 62-65. Even assuming that Plaintiffs' allegations regarding the Gap exception were sufficiently pleaded, which is not the case, such a claim is clearly one centered on Plaintiffs' right to payment under the Plan: the parties dispute the Practice's "right to full payment under the terms of the ERISA plan." *Plastic Surgery Grp., P.C. v. United Healthcare Ins. Co. of N.Y., Inc.*, 64 F. Supp. 3d 459, 467 (E.D.N.Y. 2014) (citation and emphasis omitted).

In the alternative, Plaintiffs allege that "even if [Anthem] had not granted the Practice a Gap exception," Anthem still reimbursed the claim at an improperly low amount because it did not calculate payment consistent with the Plan's terms. Compl. ¶ 69. Specifically, Plaintiffs allege that Anthem "calculated the Allowed Amount based upon 330% of the Centers for Medicare and Medicaid Provider fee schedule," which is the "Allowed Amount for non-

participating providers located in [Anthem's] service area who are not facilities." *Id.* ¶ 59. But according to Plaintiffs, this was the wrong fee schedule. Plaintiffs allege that their reimbursement should have been calculated under a separate provision of the Plan, which provides that "[w]hen Covered Services are provided outside of [Anthem's] Service Area by non-participating providers, [Anthem] may determine benefits and make payments based on pricing from either the Host Blue or the pricing arrangements required by applicable state or federal law." *Id.* ¶ 70 (first alteration in original) (quoting Plan at 16). This theory at first blush appears to implicate the "contractually correct payment amount" and therefore resembles an amount-of-payment claim. *Montefiore*, 642 F.3d at 325. However, the Plan further provides that, in "certain situations," Anthem "may use other pricing methods, such as billed charges, *the pricing* [*it*] *would use if the healthcare services had been obtained within the* [*Anthem*] *Service Area*, or a special negotiated price to determine the amount [Anthem] will pay for services provided by non-participating providers." Plan at 58 (emphasis added). The Plan cautions that, in those circumstances, the beneficiary "may be liable for the difference between the amount that the non-participating provider bills and the payment [Anthem] make[s] for the Covered Services as set forth in this paragraph." *Id.* The appropriate reimbursement due to the Practice under these provisions, as an out-of-network provider who rendered medically necessary procedures, is therefore still a coverage determination that demands "more than a mere cursory review of the plan terms." *N. Jersey Plastic Surgery Ctr.*, 2023 WL 5956142, at *20. In other words, to resolve Plaintiffs' claims, the court must still "interpret contested terms of an ERISA-governed plan." *Long Island Thoracic Surgery, P.C. v. Bldg. Serv. 32BJ Health Fund*, No. 17-cv-00163 (SJF) (AYS), 2019 WL 7598669, at *14 (E.D.N.Y. Sept. 3, 2019), *report and recommendation adopted*, 2019 WL 5060495 (E.D.N.Y. Oct. 9, 2019).

Ultimately, under either theory of underpayment, Plaintiffs' state law claims depend upon coverage for out-of-network providers outside of Anthem's service area as set forth under the express terms of the Plan.  Both the Practice's scope of coverage and the amount of payment owed to the Practice are pegged to the Plan's terms.  A claim regarding the appropriate reimbursement rate for an out-of-network provider such as the Practice therefore does not fall within the "narrow definition" for "amount of payment" claims: Plaintiffs' claims are not "disputes over the 'contractually correct payment amount,' the 'proper execution of the monetary transfer,' 'the timeliness of payment,' or 'the proper form of payment.'"  *Enigma Mgmt. Corp. v. Multiplan*, *Inc*., 994 F. Supp. 2d 290, 300-01 (E.D.N.Y. Jan. 27, 2014) (quoting *Montefiore*, 642 F.3d at 325 & n.3).  In an amount-of-payment claim, the "basic right to payment has already been established and the remaining dispute only involves obligations derived from a source other than the [ERISA-governed benefit plan]."  *Montefiore*, 642 F.3d at 331; *Neuroaxis Neurosurgical Assocs*., 2012 WL 4840807, at *4 ("'Amount of payment' claims involve the calculation and execution of reimbursement payments, depend on the extrinsic sources used for the calculation, and are commonly tied to the rate schedules and arrangements included in the provider agreements.").  But where, as here, a "case goes beyond a 'simple rate calculation analysis' and requires interpretation of the terms of the ERISA plan, it cannot be considered an 'amount of payment' case."  *Enigma Mgmt. Corp*., 994 F. Supp. 2d at 301 (quoting *N. Shore-Long Island Jewish Health Care Syst., Inc. v. Multiplan, Inc.*, 953 F. Supp. 2d 419, 439 (E.D.N.Y. 2013)).[18]

---

[18] Plaintiffs' own cited authority is illustrative of the narrow set of circumstances under which claims are construed as implicating the "amount of payment" rather than the "right to payment." In *Long Island Thoracic Surgery, P.C. v. Building Service 32BJ Health Fund*, plaintiffs alleged that an extrinsic source relied upon by the Plan in setting the reimbursement rate — the Fair Health Organization's fee schedule — provided rates that were arbitrary and artificially low.

For the aforementioned reasons, the Court finds that Plaintiffs' state law claims are expressly preempted by ERISA. *See Park Ave. Podiatric Care*, 2024 WL 2813721, at *2 (Second Circuit affirming that Plaintiffs' state law claims were expressly preempted by ERISA because "any legal duty Cigna ha[d] to reimburse [the provider] ar[ose] from its obligations under the patient's ERISA plan").

## III.    Leave to Amend

Plaintiffs request that, to the extent the Court determines there are any deficiencies in the Complaint, they be provided leave to replead. Opp. at 23. Leave to amend should be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), except in instances of "futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party," *United States ex rel. Ladas v. Exelis, Inc*., 824 F.3d 16, 28 (2d Cir. 2016) (citation omitted); *accord Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008). "[I]n the absence of a valid rationale like undue delay or futility, it is improper to simultaneously dismiss a complaint with prejudice under Rule 12(b)(6) and deny leave to amend when the district court has not adequately informed the plaintiffs of its view of the complaint's deficiencies." *In re Lottery.com, Inc. Sec. Litig*., 715 F. Supp. 3d 506, 561-62 (S.D.N.Y. 2024) (quoting *Mandala v. NTT Data, Inc*., 88 F4th 353, 363 (2d Cir. 2023)). "Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be

---

2019 WL 7598669, at *14. The court thus found that plaintiffs' claim ultimately "turn[ed] on the methodology that the Fair Health Organization . . . utilized to arrive at that rate; a determination [that] does not depend upon the terms of any ERISA-governed insurance agreements." *Id.*; *see also Garber v. United Healthcare Corp.*, No. 15-cv-1638 (SJF) (GRB), 2016 WL 1734089, at *5 (E.D.N.Y. May 2, 2016) (claim not preempted where plaintiff did not "allege that United failed to pay the percentage of the UCR specified in any of the assigned member plans, or breached any other terms of those plans" but instead alleged that the "Fair Database UCR" relied upon by the plan was "an incorrect and artificially low reference point").

in a position to weigh the practicality and possible means of curing specific deficiencies."

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

The Court has now pointed out that various arguments that were raised in Plaintiffs' briefs are

not supported by the allegations in the Complaint, the case is in a relatively early stage, there has

been no undue delay by Plaintiffs, and there is no apparent unfair prejudice to the Defendants.

The Court will therefore grant Plaintiffs leave to file an amended complaint.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to dismiss is GRANTED. Plaintiffs' claims

are dismissed, but Plaintiffs are granted thirty (30) days from the date of this Opinion and Order

to amend their Complaint. If an amended complaint is not filed by April 28, 2025, the Court will

order that judgment be entered in favor of the Defendants.

The Clerk of Court is respectfully directed to close the gavel at Dkt. 27.

Dated: March 28, 2025
       New York, New York

SO ORDERED.

*Jennifer Rochon*
JENNIFER L. ROCHON
United States District Judge